Filed 5/11/16  P. v. Jackson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069654 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1203158) |
| QUADREA JACKSON et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Riverside County, Angel M. Bermudez, Judge.  Affirmed as modified.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant Quadrea Jackson.

Alissa Bjerkhoel, under appointment by the Court of Appeal, for Defendant and Appellant John Kiriakos.

Law Offices of Zulu Ali and Zulu Ali for Defendant and Appellant Sandi Salah.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

The victim in this case returned home to find Shabock Jamerson and appellants Quadrea Jackson and Sandi Salah burglarizing his home, as appellant John Kiriakos acted as a lookout down the street. The three perpetrators inside the home beat the victim, threatened to kill him and his 12-year-old son, and forced the victim to open two gun safes. The perpetrators took 12 or 13 guns from the safes (as well as other personal property), loaded them into the victim's truck, and drove off in that truck and another getaway car. Jackson, Kiriakos, and Salah (collectively, Appellants) were convicted of, among other things, robbery (Pen. Code, §§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A))[1] and vehicle-taking (Veh. Code, § 10851, subd. (a)). Jackson and Kiriakos were also convicted of being felons in unlawful possession of four of the stolen firearms. (§ 29800, subd. (a)(1).)

On appeal, Jackson and Kiriakos contend the trial court violated section 654's proscription against duplicative punishments by not staying the sentences on their felon-in-possession and vehicle-taking convictions as being duplicative of the sentences on their robbery convictions. We agree, and will modify the judgments to stay the sentences on their felon-in-possession and vehicle-taking convictions.

---

[1]     Undesignated statutory references are to the Penal Code.

Salah alone contends he received ineffective assistance of counsel at trial, and that insufficient evidence supports his convictions. His contentions are without merit. However, because Salah is similarly situated to Jackson and Kiriakos with respect to duplicative sentences on his robbery and vehicle-taking convictions, we will modify the judgment to stay the sentence on his vehicle-taking conviction—despite the fact Salah failed to raise this error on appeal. (See *People v. Hester* (2000) 22 Cal.4th 290, 295 [" 'Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal.' "].)

As so modified, we affirm the judgments.

FACTUAL AND PROCEDURAL BACKGROUND

*The Prosecution Case*[2]

At the time of the incident, Jamerson and Jackson had known each other for a few months. Jamerson was an admitted drug dealer; Jackson had purchased drugs from Jamerson and occasionally sold them on his behalf. Between midnight and 1:00 a.m. on August 29, 2012, Jamerson loaned Jackson a revolver. Three or four hours later, Jackson returned to Jamerson's mobile home and solicited his participation in a burglary. Jackson explained that two other men had information about a house that contained $100,000. They expected the home to be unoccupied, and needed one more person to act as a

---

[2] The People established the circumstances of the offenses primarily through the testimony of the victim and Jamerson. Jamerson informed the jury that he cooperated under a grant of immunity and a plea agreement.

lookout. Each participant would receive an equal share of the proceeds. Jamerson agreed to participate, and Jackson left.

A few hours later, Jackson, Kiriakos, and Salah picked up Jamerson in Kiriakos's car. Jamerson had not met Kiriakos or Salah before. They drove to Jackson's apartment, where Jamerson and Jackson changed clothes to disguise themselves. Salah retrieved something from his own apartment in the same complex. In the car, Kiriakos informed the group the target house had changed to a house he and Salah had been "scoping out" for two or three months. Kiriakos claimed to have previously lived in the house, and said it had five safes that contained money and guns. Kiriakos said no one would be home.

En route to the victim's house, Kiriakos confirmed Salah had brought duct tape with him. The men made makeshift bandanas from a red shirt Salah produced in the car. Jackson showed Salah the revolver Jamerson had loaned him; Salah held and examined it, then returned it to Jackson. Kiriakos parked his car at a park "catty-corner" from the victim's house, and the men waited for the victim to leave.

The victim was a 53-year-old semi-retired farmer who was raising his 12-year-old son on his own. At about 7:45 a.m., the victim drove his son to school in a 2002 Ford F-350 truck, accompanied by the family dog.

After the victim left, Jackson, Jamerson, and Salah went into his house. Salah entered first through a window, followed by Jamerson, who then opened a door for Jackson. The men searched the house and located two large gun safes: one in a bedroom and one by the front door. The men did not have the combinations, and the safes were too large to take. Jackson called Kiriakos on a cell phone to ask about the location of

4

other safes, but Kiriakos said he did not know.  The men then searched the house for other valuables.  Jackson found the victim's home-protection shotgun in the master bedroom and took it.

Around 8:30 a.m., Kiriakos warned Jackson by cell phone that the victim was pulling into the driveway.  The victim sat in his parked truck and spoke on his cell phone for a few minutes before entering his home.  As the victim approached the house, his dog began barking.  As soon as the victim opened the door, the dog ran into the living room and growled viciously.  The victim ran after the dog, thinking his cat may have gotten inside.  Instead, the victim saw his dog growling and nipping at Jamerson, who kicked the dog and ran down a hallway.  As the victim turned to flee, Jackson struck him in the face with a fist or open hand, which stunned the victim, knocked off his glasses, and caused him to fall to one knee.  Salah had an icepick in his hand and asked Jamerson if he should stab the victim.  Jamerson said no.

Jamerson and Salah picked up the victim by his arms.  Jackson pointed the revolver at the victim's face, and Salah carried the victim's shotgun.  The men forcibly moved the victim to the safe in the bedroom and ordered him to open it.  Jackson stuck the revolver in the victim's mouth and cocked the hammer; the victim could see that it was partially loaded. Jackson pulled the trigger once or twice, but the gun did not fire. The victim became nervous and was unable to open the safe.  Jackson struck the victim in the head with the revolver, causing him to bleed and lose feeling in his feet and right arm. Jackson repeatedly threatened to kill the victim.

Jamerson and Salah dragged the victim to the safe by the front door, while Jackson kept the revolver jammed in the victim's mouth. Jackson told the victim to open the safe. Each time the victim unsuccessfully tried to do so, Jackson struck him with the gun. Jackson threatened to kill the victim, and told him they had his son and would kill him, too. The victim eventually opened the safe, revealing seven or eight guns, ammunition, and personal effects. Jackson instructed Jamerson to gather up the safe's contents, which he did.

As Jamerson did so, Salah and Jackson took the victim back to the safe in the bedroom. This time the victim was able to open the safe, which contained four guns. Jackson had Jamerson also collect the contents of this safe.

The victim, who is diabetic, began to feel faint and thought he would pass out. He asked for his insulin, and the men took him to the bathroom. On the way, Jackson threatened to pour gasoline on the victim and burn him in his bathtub. The victim administered an insulin shot to himself.

Salah and another perpetrator then took the victim to the kitchen and sat him down in a chair. Salah produced a bag with duct tape and rope, secured the victim to the chair, "[y]anked" a Saint Christopher medallion and gold chain from the victim's neck, and told him to " 'shut the fuck up.' " Salah hit the victim's head with the butt of the shotgun.

While Salah guarded the victim in the kitchen with the shotgun, Jackson and Jamerson looted the kitchen and the rest of the house. They took a video game system, a television, and other miscellaneous items.

6

Jackson returned to the kitchen, put the revolver in the victim's face, asked where the money was, and threatened to kill the victim. The victim said he did not have any cash. Jackson said they would kill the victim's son if the victim did not tell them where the money was. Jackson mentioned the son's teacher by name, said they had pulled him from class, and said they had a gun pointed at his head. Salah said, " 'I don't give a damn about your fucking son.' "

Jackson ordered Jamerson to load all the loot into the victim's truck, which Jamerson did. The victim went in and out of consciousness. Jackson wanted to kill him, but Jamerson convinced him not to. When the victim regained consciousness, Jackson whispered in his ear that they were not going to kill him, but warned that they still had his son. The victim fainted.

The men left. Salah left in Kiriakos's car, and Jamerson drove off in the victim's truck with Jackson in the passenger seat. The victim awoke to the sound of his truck leaving; he partially freed himself and called 911.

The men caravanned to a storage space where Kiriakos had an office. They brought the guns into the office and divided them four ways. Salah gave his share to Kiriakos. Kiriakos told Jackson and Jamerson to get rid of the truck.

Jackson drove Jamerson in the truck back to Jamerson's trailer park, where they began unloading it. Jamerson's neighbors crowded around the truck, and he and Jackson let them help themselves to tools and other items that were still in the truck. Jamerson attempted to sell his guns immediately, but sheriff's deputies arrived within minutes. After a standoff, SWAT team members arrested Jackson and Jamerson. Jackson had the

7

victim's money clip in his pocket, and sheriff's personnel found four of the victim's guns and his wallet and identification inside Jamerson's trailer.

Upon being told by investigators—falsely—that Jackson was cooperating with them, Jamerson agreed to cooperate. His cell phone records led detectives to Kiriakos. A search of Kiriakos's car yielded duct tape and a holster that appeared to match the revolver used in the robbery.

Security camera footage from the victim's neighbor revealed the men were in the victim's home for about 100 minutes.

The People charged Appellants with the following: kidnapping to commit robbery (§ 209, subd. (b)(1); count 1); torture (§ 206; count 2); robbery, in concert, of an inhabited dwelling house (§§ 211, 212.5, subd. (a), 213, subd. (a)(1)(A); count 3); assault with a firearm (§ 245, subd. (a)(2); count 4); making a criminal threat (§ 422; count 5); vehicle-taking (Veh. Code, § 10851, subd. (a); count 6); burglary (§ 459; count 7); and grand theft of firearms (§ 487, subd. (d); count 8). The People also charged Jackson and Kiriakos with four counts each of unlawful possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); counts 9-12). The People alleged firearm enhancements on the kidnapping, torture, robbery, and assault with a firearm counts.

*The Defense Case*

At trial, Appellants essentially conceded the People had proven the majority of their case, but asserted the People had overcharged on the kidnapping and torture counts. Appellants argued they did not move the victim a sufficient distance to support a kidnapping conviction, and asked the jury to instead convict on the lesser included

8

offense of false imprisonment.  Similarly, Appellants downplayed the significance of the victim's injuries to negate the great-bodily-injury element of torture, and asked the jury to instead convict on the lesser included offense of assault with a deadly weapon.  The sole defense witness was a pathologist who supported this argument.

*Jury Verdict and Sentencing*

Following a joint trial, the jury found Appellants guilty of false imprisonment as a lesser included offense of kidnapping (§ 236, count 1), and guilty of assault with a deadly weapon as a lesser included offense of torture (§ 245, subd. (a)(1), count 2).  The jury found Appellants guilty as charged in all the remaining counts, and found the firearm allegations true.

Jackson and Kiriakos admitted having suffered prior felony convictions as alleged in counts 9 through 12, and Kiriakos admitted he committed the current offenses while on bail.

At the sentencing hearing, Appellants argued section 654 required the trial court to stay the sentences on their felon-in-possession and vehicle-taking convictions as being duplicative of the sentences on their robbery convictions.  The trial court disagreed.

On the felon-in-possession sentences, the court explained that applying section 654 could result in unjustly imposing the same punishment on two perpetrators where one was a felon in possession (and therefore more culpable) and the other was not.  The court reasoned this outcome would not "recognize the deterrent effect of the law" and would be inconsistent with recent California Supreme Court authority that upheld

9

imposing separate felon-in-possession sentences for each firearm a felon possesses. (See *People v. Correa* (2012) 54 Cal.4th 331 (*Correa*).)

On the vehicle-taking sentences, the court found section 654 applied to the taking of the truck *keys* because that occurred during the robbery, but not to the taking of the truck *itself* because when "the motor vehicle is loaded and started, a separate and distinct intent takes place when that vehicle is driven off."

The court sentenced Jackson to a total prison term of 19 years four months; Kiriakos to a total prison term of 15 years four months; and Salah to a total prison term of 19 years eight months. These sentences include one consecutive eight-month term for each Appellant's vehicle-taking conviction, and additional consecutive eight-month terms for each of Jackson's and Kiriakos's four felon-in-possession convictions.

## DISCUSSION

### I. *Sentencing Error*

In general terms, "section 654 proscribes double punishment for multiple violations of the Penal Code based on the 'same act or omission.' " (*People v. Siko* (1988) 45 Cal.3d 820, 822.) Jackson and Kiriakos contend the trial court's failure to stay the sentences on their felon-in-possession and vehicle-taking convictions violates section 654 because the firearms and vehicle underlying those convictions were the objects of the robbery for which they were separately convicted and sentenced. We agree.

### A. *Overview of Section 654*

Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

10

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211 (*Latimer*).)

Section 654 "generally precludes multiple punishments for *a single physical act* that violates different provisions of law [citation] as well as multiple punishments for an *indivisible course of conduct* that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*).) " 'Whether *a course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*Rodriguez*, at p. 507, quoting *Neal*, at p. 19.) "If, on the other hand, '[the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Martin* (2005) 133 Cal.App.4th 776, 781.)

"Whether the facts and circumstances reveal a single intent and objective within the meaning of . . . section 654 is generally a factual matter; the dimension and meaning of section 654 is a legal question." (*People v. Guzman* (1996) 45 Cal.App.4th 1023, 1028; *Neal, supra*, 55 Cal.2d at p. 17.)

11

## B. *Jackson's and Kiriakos's Felon-in-Possession Sentences*

"Case law establishes the guidelines for applying section 654 in the context of a conviction for possession of a prohibited weapon. ' "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the [weapon] has been held to be improper where it is the lesser offense." ' " (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217 (*Wynn*), brackets in original; see *People v. Bradford* (1976) 17 Cal.3d 8, 22 (*Bradford*); *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1408-1409 (*Ratcliff*).)

"Applying this rule, courts have determined that section 654 applies where the defendant obtained the prohibited weapon *during* the assault in which he used the weapon. (*Bradford, supra*, 17 Cal.3d at pp. 13, 22 . . . [§ 654 applied to possession of a firearm and assault counts when the defendant took a police officer's firearm from him and used it to assault the officer]; *People v. Venegas* (1970) 10 Cal.App.3d 814, 821 . . . [no evidence that the defendant had possession of the firearm used in a barroom fight until the shooting took place, so that '[n]ot only was the possession physically simultaneous, but the possession was incidental to only one objective, namely to shoot [the victim].'].) However, section 654 has been found not to apply when the weapon possession preceded the assault. (*Ratcliff, supra*, 223 Cal.App.3d at p. 1413 ['[T]he defendant already had the handgun in his possession when he arrived at the scene of the first robbery. A justifiable inference from this evidence is that defendant's possession of

12

the weapon was not merely simultaneous with the robberies, but continued before, during and after those crimes. Section 654 therefore does not prohibit separate punishments.'].)" (*Wynn, supra*, 184 Cal.App.4th at p. 1217.)

In *People v. Atencio* (2012) 208 Cal.App.4th 1239 (*Atencio*), our colleagues in the Third District concluded section 654 applied in the closely analogous context of a defendant who was sentenced separately for grand theft of a firearm and for being a felon in possession of that stolen firearm. (*Atencio*, at pp. 1241-1242.) In *Atencio*, the defendant stole jewelry and at least one handgun while cleaning the victim's home. (*Id.* at p. 1241.) He was apprehended the next day while trying to sell the items to an acquaintance. (*Ibid.*) The trial court, finding that the theft and unlawful firearm possession convictions were " 'two crimes and their objectives were predominantly independent of each other,' " imposed consecutive sentences and did not stay either. (*Id.* at p. 1242.) The Court of Appeal reversed.

The *Atencio* court discussed the California Supreme Court's ruling in *People v. Jones* (2012) 54 Cal.4th 350 (*Jones*), which examined the propriety of imposing three separate sentences arising from a convicted felon's "single physical act" of being "found with a loaded firearm that was not registered to him concealed in the door panel of the car he was driving." (*Atencio, supra*, 208 Cal.App.4th at p. 1243.)[3] The Supreme Court held "that the defendant could be punished only once for the three crimes of which he

---

3    The jury convicted Jones of "possession of a firearm by a felon," "carrying a readily accessible concealed and unregistered firearm," and "carrying an unregistered loaded firearm in public." (*Jones, supra*, 54 Cal.4th at p. 352.)

was convicted." (*Ibid*., citing *Jones*, at pp. 352, 360.)  In light of *Jones*, the *Atencio* court concluded the defendant could be punished only once because his taking and keeping of the firearm until the next day was either a "single physical act" or an indivisible course of criminal conduct.  (*Atencio*, at pp. 1243-1244.)  As to the latter, the court rejected the Attorney General's argument that the defendant harbored separate criminal objectives.  (*Id.* at p. 1244.)  The court explained:  "To say that defendant's objective on the first day was to *take* the gun, while his objective on the next day was to *possess* it is cutting the point too fine.  The only point in *taking* the gun was to *gain possession* of it, so that he could then do with it what he pleased, whether 'possess[ing] [it] while selling jewelry' or something else.  The fact that defendant kept possession of the gun for a period of 24 hours did not, without more, alter his intent and objective such that his course of criminal conduct can be deemed to consist of more than one act for purposes of section 654."  (*Ibid*.)

Following the general rules regarding section 654's application to cases involving firearms (see *Wynn, supra*, 184 Cal.App.4th at p. 1217), as exemplified in *Atencio*, we conclude section 654 applies to Jackson's and Kiriakos's felon-in-possession sentences.  As was the case in *Atencio*, the record here indicates the perpetrators' single objective was to steal the victim's personal belongings, which included guns and money.  Indeed, the Attorney General "agrees that the objective of the robbery was, among other things, to steal [the victim's] guns."  That the perpetrators promptly regrouped to divide the guns among themselves after the robbery and at least one of them (Jamerson, while in Jackson's presence) immediately tried to sell them indicates the perpetrators valued the

14

firearms for their monetary value and not for their use as tools of the criminal trade.[4]

Thus, because Jackson and Kiriakos came into possession of the guns that underlie their felon-in-possession convictions *during* and as part and parcel of their robbery of the victim, punishing them for both the robbery and felon-in-possession convictions violates section 654.[5]

The Attorney General contends *Atencio* was wrongly decided, arguing that in *Correa, supra*, 54 Cal.4th 331 the California Supreme Court recognized the legislative policy that felons in possession of firearms be punished more severely than other criminals. We are not persuaded. The defendant in *Correa* was a felon who possessed seven firearms when he was apprehended by a SWAT team. (*Id.* at pp. 334-335.) The Supreme Court held section 654 did not preclude punishing the defendant separately for each of the firearms he possessed. (*Correa*, at p. 334.) The court's reasoning was twofold. First, "[b]y its plain language section 654 does not bar multiple punishment for

---

[4]    By contrast, the appellate court in *People v. Garfield* (1979) 92 Cal.App.3d 475 concluded section 654 did not preclude separate punishments on convictions for burglary and possession of a weapon (taken during the burglary) by a narcotics addict (see, e.g., § 29800, subd. (a)(1)) where the defendant was apprehended six days later, "and more importantly the gun was not 'cached' or stored with the rest of the fruits of the burglary . . . ." (*Garfield*, at pp. 477-478.) In finding a "clearly distinct offense" (*id.* at p. 478), the court "emphasize[d] the circumstances of his possession"—that is, he treated the firearm differently than the rest of the loot—"rather than the mere passage of time as the key element supporting it." (*Ibid*.) Here, there is no evidence indicating the perpetrators considered the firearms different from any of the other proceeds of the robbery.

[5]    The same would not hold true for the revolver they possessed *before* the robbery began. (See *Wynn, supra*, 184 Cal.App.4th at p. 1217.) Curiously, however, Jackson and Kiriakos were not charged with being felons in possession of *that* firearm.

15

multiple violations of the *same* criminal statute." (*Ibid*., italics added; see *id.* at p. 341 [noting section 654 applies to " '[a]n act or omission that is punishable in different ways *by different provisions of law . . . .*' "], italics added.) The court disapproved contrary dictum contained in a footnote to its earlier decision in *Neal, supra*, 55 Cal.2d at page 18, footnote 1. (*Correa*, at p. 334.) Second, *Correa* recognized that "[t]he Legislature has made it clear that the magnitude of a felon's culpability depends on the number of weapons possessed" (*id.* at p. 342) by specifying "that the possession of 'each firearm . . . shall constitute a distinct and separate offense' " for being a felon in possession of a firearm (*ibid*., quoting former § 12001, subd. (k), now § 23510).

Based on *Correa*'s second rationale, the Attorney General argues that applying section 654 to sentences imposed on robbery and felon-in-possession convictions "conflicts with the legislative goal recognized in *Correa*, because if only the robbery could be punished, the robbery by a felon of any number of firearms could not be punished more than robbery of a single firearm." (See, e.g., *Correa, supra*, 54 Cal.4th at p. 342 ["a felon who possesses several firearms is more culpable than one who possesses a single weapon"].) The Attorney General further argues that applying section 654 in the manner Jackson and Kiriakos urge would undermine the statute's purpose of ensuring punishments are commensurate with culpability. While the argument has appeal, the Attorney General acknowledges in her briefing that the Supreme Court recognized in *Correa* that applying *Neal*'s " 'intent and objective' " test will not always ensure punishment is commensurate with culpability. (*Correa*, at p. 341.) Yet, the California Supreme Court has repeatedly declined to "repudiate[] the long-standing holding of

16

*Neal*." (*Ibid.*; *Jones, supra*, 54 Cal.4th at pp. 369-370 (conc. opn. of Liu, J.) ["The *Neal* test has been criticized. But this court unanimously reaffirmed the test—warts and all—in [*Latimer, supra*, 5 Cal.4th at pp. 1205-1206] after lengthy and thoughtful consideration of whether it should be overruled."].) Because the California Supreme Court declined to repudiate *Neal*'s intent and objective test, we must too. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Our conclusion is also consistent with California Supreme Court precedent in the analogous context of applying section 654 to sentences imposed on convictions for robbery and unlawful possession of narcotics taken during that robbery. (See *People v. Quinn* (1964) 61 Cal.2d 551, 555-556 ["the theft and possession of the narcotics . . . and the robbery were all part of an indivisible criminal transaction"]; see also *People v. Austin* (1994) 23 Cal.App.4th 1596, 1613 ["The facts of this case show, indisputably, the defendants had but one intent and objective and that was to obtain possession of a large quantity of cocaine which they could then sell; the robbery of the trunk key and the cocaine itself was merely the means to that end."], disapproved of on another ground by *People v. Palmer* (2001) 24 Cal.4th 856, 861.) We see no reason to depart from that reasoning in this analogous status offense.

In sum, because we conclude the trial court erred by not staying Jackson's and Kiriakos's sentences on their felon-in-possession convictions (counts 9-12), we will modify the judgments to stay their sentences on those counts.

17

C.  *Appellants' Vehicle-Taking Sentences*

Jackson and Kiriakos contend section 654 required the trial court to stay the sentences on their vehicle-taking convictions (count 6) as being duplicative of the sentences on their robbery convictions.  Citing *People v. Bauer* (1969) 1 Cal.3d 368 (*Bauer*), the Attorney General concedes the error.

In *Bauer*, the defendant and another man impersonated utility workers to persuade three elderly female housemates to let the perpetrators inside.  (*Bauer, supra*, 1 Cal.3d at p. 372.)  Once inside, the perpetrators drew weapons, restrained the women, "ransack[ed] the house and carr[ied] the loot to the garage."  (*Ibid*.)  After about two hours, the perpetrators drove away in one victim's car.  (*Ibid*.)  The Supreme Court held section 654 applied to the robbery and vehicle theft counts, explaining:  "[W]here a defendant robs his victim in one continuous transaction of several items of property, punishment for robbery on the basis of the taking of one of the items and other crimes on the basis of the taking the other items is not permissible."  (*Id.* at p. 377.)  The Attorney General argued in *Bauer* that the robbery and vehicle theft were separate offenses because the "robbery was complete before the theft of the car began and that the theft of the automobile was an afterthought to the original transaction."[6]  (*Ibid.*)  The court rejected this argument, explaining:  "The fact that one crime is technically complete before the other commenced does not permit multiple punishment where there is a course of conduct comprising an

---

[6]    By contrast, the prosecutor here argued during closing that the suggestion "that there was no plan to take the truck, that it was some sort of last-minute idea," is "a bunch of garbage."

18

indivisible transaction . . . .  Moreover, the evidence . . . does not show that the theft of the car was an afterthought but indicates to the contrary that the robbers, who while ransacking the house were carrying the stolen property to the garage, formed the intent to steal the car during the robbery if not before it."  (*Ibid*.; see also *People v. Smith* (1992) 18 Cal.App.4th 1192, 1194-1195, 1199 [following *Bauer* and applying section 654 to sentences on robbery and vehicle-taking convictions arising from defendant's robbery of money and a car during robbery that began in victim's home].)

Based on the Attorney General's concession that this case is "on all fours" with *Bauer*, we conclude the trial court erred by not staying the sentences on Appellants' vehicle-taking convictions.  Accordingly, we will modify the judgments to stay each Appellant's—including Salah's—respective sentence on count 6.

## II.  *Ineffective Assistance of Counsel*

Salah contends his trial counsel was ineffective because he failed to (1) move for separate trials, (2) cross-examine the victim about Salah's specific role in the crimes, and (3) object to a leading question that called for hearsay.  We reject these contentions.

### A.  *Ineffective Assistance Standards*

To establish a claim of ineffective assistance of counsel under the Sixth Amendment, a defendant bears the burden of showing:  (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694

19

(*Strickland*); *People v. Hinton* (2006) 37 Cal.4th 839, 876.)  Courts may address the two prongs in whichever order is most efficient, and need not address one if the other is lacking.  (*Strickland*, at p. 697.)

In examining whether a defendant met his burden on the first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  (*Strickland, supra*, 466 U.S. at p. 689; see *People v. Hinton, supra*, 37 Cal.4th at p. 876.)  We will not find ineffective representation "unless there could be no conceivable reason for counsel's acts or omissions."  (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

### B.  *Separate Trials*

Salah contends his trial counsel was ineffective because he failed to move for a separate trial, which prejudiced him "because the jury found him guilty by association, simply based on the criminal history of his codefendants."  We are not persuaded.

Salah does not address *Strickland*'s prejudice prong—that is, he does not explain why the trial court would have granted a motion for separate trials if he had brought one. We therefore reject this challenge as not properly raised.  (See *People v. DeSantis* (1992) 2 Cal.4th 1198, 1224, fn. 8.)

In any event, given the Legislature's "strong preference for joint trials" (*People v. Souza* (2012) 54 Cal.4th 90, 109; see § 1098), the discretion vested in trial courts when ruling on motions for separate trials (*People v. Myles* (2012) 53 Cal.4th 1181, 1200), and jurors' ability to differentiate between defendants despite the fact "an accused would rather not be associated in the jury's mind with other potentially unsavory characters"

20

(*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 381), we are confident the trial court would have denied a motion for separate trials if Salah's counsel had brought one.

### C. *Cross-examining the Victim*

Salah next contends his trial counsel was ineffective because he failed to cross-examine the victim about Salah's role in the crime, such as whether Salah struck the victim, personally threatened him, or moved the safes. He asserts cross-examination in this manner "*could have* shown that [Salah] may not have had an active role in the crime in progress." (Italics added.) We find no error.

"The cross-examination of witnesses is a matter falling within the discretion of counsel, and rarely provides an adequate basis on appeal for a claim of ineffective assistance of counsel." (*People v. Frye* (1998) 18 Cal.4th 894, 985, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Despite Salah's claim on appeal to the contrary, his trial counsel did, in fact, ask the victim whether Salah had hit him, and the victim responded that Salah had.[7] Given the victim's emphatic response to this question, and his other testimony on cross-examination stating he was 100 percent certain of Salah's involvement in the crimes, we will not second-guess whether Salah's trial counsel had legitimate tactical reasons for not further cross-examining the victim in the manner Salah now urges he should have.

---

[7] "Q. And the person that you think was there and that you've identified as Mr. Salah also never hit you, did he? [¶] A. No, he did hit me, sir."

21

### D. *Objecting on Leading and Hearsay Grounds*

The prosecution called Jeremy Branch to identify people he saw in Jamerson's trailer park the morning of the robbery. Branch testified he did not want to be involved in the court proceedings, and his testimony was noncommittal. When the prosecutor showed Branch a picture of Salah and asked if he recognized it, Branch asked if it was "Handi or something." The prosecutor asked Branch if he remembered an investigator asking about a photograph of Salah. Branch testified he told the investigator he had smoked with the person, but did not know him personally or remember his name. The following exchange then occurred regarding Branch's discussion with the investigator about Salah's picture:

> "Q. Do you recall replying, [']That's Sandi['] . . . . And [the investigator] says, [']That's Sandi?['] That's . . . how you know Sandi. And you replied, [']That's Sandi.['] [¶ ] Do you recall that?"
>
> "A. I don't."

Salah contends his trial counsel was ineffective for not objecting to this question on leading and hearsay grounds. We disagree.

First, Salah has not met his burden under the first *Strickland* prong. " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' " (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Salah has not explained why failing to object to the quoted questioning falls outside this general rule.

22

Second, Salah has not established the second *Strickland* prong inasmuch as it is reasonably probable the trial court would have overruled the objections. "A 'leading question' is a question that suggests to the witness the answer that the examining party desires." (Evid. Code, § 764.) A "prosecutor's use of 'do you remember' . . . questions [is] not leading. 'Questions calling for a "yes" or "no" answer are not leading unless they are unduly suggestive under the circumstances.' " (*People v. Collins* (2010) 49 Cal.4th 175, 216.) "Leading questions are permitted on direct examination 'to the extent necessary to stimulate or revive [the witness's] recollection.' " (*Id.* at p. 215.) Quoting from the witness's own prior statements makes "improper suggestion unlikely." (*Id.* at p. 216) Because the prosecutor here asked Branch a "do you [recall]" question about his own prior statement, the question was not leading. (*Ibid.*)

Nor did the question solicit inadmissible hearsay. "Evidence Code sections 770 and 1235 except from the general rule against hearsay a witness's prior statement that is inconsistent with the witness's testimony in the present hearing, provided the witness is given the opportunity to explain or deny the statement . . . ." (*People v. Avila* (2006) 38 Cal.4th 491, 579.) Branch's prior statement to the investigator identifying Salah by name was inconsistent with his trial testimony that he told the investigator he did not remember Salah's name. Because Branch had an opportunity to explain his prior inconsistent statement while testifying, the statement fell within an exception to the hearsay rule.

### III. *Sufficiency of the Evidence*

Salah contends insufficient evidence supports his convictions. Specifically, he attacks the victim's credibility, citing the victim's testimony that the perpetrators wore

23

masks to obscure their faces, and that he was feeling disoriented due to his diabetes and the head trauma he sustained during the robbery. Salah attacks Jamerson's credibility because Jamerson "mixed up certain details of the events," admitted he was not with Salah the entire time, and was "only testifying out of his own self-interest." The contention fails, as the evidence against Salah was overwhelming.

"The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296 (*Scott*).) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

The victim testified he was 100 percent certain Salah was one of the robbers; Salah carried him from safe to safe; Salah tied him up; Salah struck him in the head with the butt of a shotgun; Salah threatened his son; and Salah "[y]anked" a necklace from the victim's neck. Jamerson testified Salah had been scoping out the victim's home for months; Salah brought duct tape; Salah handled and examined the revolver; Salah asked Jamerson whether he should stab the victim with an icepick; Salah actively participated in all aspects of the robbery; and Salah participated in dividing the proceeds of the robbery.

None of the circumstances Salah cites—that is, the victim's "perception of the events" or "Jamerson's motives"—are "physically impossible or inherently improbable."

24

(*Scott, supra*, 21 Cal.3d at p. 296.)  Accordingly, Salah's challenge to the sufficiency of the evidence fails.

## DISPOSITION

Jackson's and Kiriakos's sentences are modified to stay the term of imprisonment on their convictions on count 6 for vehicle-taking and counts 9 through 12 for unlawful possession of a firearm by a felon.  Salah's sentence is modified to stay the term of imprisonment on his conviction on count 6 for vehicle-taking.  As modified, the judgments are affirmed.  The trial court is directed to prepare modified abstracts of judgment and to forward the amended abstracts to the Department of Corrections and Rehabilitation.

HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.

25